Susan M. Rotkis (AZ: 032866)
*Admitted pro hac vice*
**CONSUMER ATTORNEYS**
2290 East Speedway Blvd.
Tucson, AZ 85716
T: (602) 807-1504
F: (718) 715-1750
E: srotkis@consumerattorneys.com

Youssef H. Hammoud (SBN: 321934)
**HAMMOUD LAW, P.C.**
3744 E. Chapman Ave., #F12269
Orange, CA 92859
T: (949) 301-9692
F: (949) 301-9693
E: yh@lawhammoud.com

*Attorneys for Plaintiffs,*
*Hala Ahmed and Maali Salim,*
*on behalf of themselves and all similarly situated individuals*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HALA AHMED and MAALI SALIM, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> TRANS UNION LLC, TRANSUNION RENTAL SCREENING SOLUTIONS, INC. and RENTSPREE, INC., <br><br> Defendants. | Case No.: 8:24-cv-00057-DOC-DFM <br><br> **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' JOINT MOTION FOR JUDGMENT ON THE PLEADINGS** <br><br> **Date: December 30, 2024** <br> **Time: 8:30 A.M.** <br> **Ctrm: 10A** |

i

Plaintiffs Hala Ahmed ("Ms. Ahmed") and Maali Salim ("Ms. Salim") (collectively "Plaintiffs") submit this Memorandum of Points and Authorities in Opposition to the Joint Motion for Judgment on the Pleadings of Defendant Trans Union, LLC ("Trans Union"), Defendant TransUnion Rental Screening Solutions, Inc. ("TURSS"), and Defendant RentSpree, Inc. ("RentSpree") [Dkt. 63, the "Joint Motion"].

# <u>Contents</u>

I.        INTRODUCTION………………………………………………………………1

II.       STATEMENT OF FACTS ................................................................3

III.      LEGAL STANDARD..........................................................................7

IV.      ARGUMENT ......................................................................................8

A. Plaintiffs have alleged sufficient facts to state a plausible claim under the Unruh Act because Defendants are all commercial enterprises covered under the Act, because Plaintiffs have alleged facts showing that Defendants' purportedly neutral policy effected discrimination against immigrants and others by proxy, and because Plaintiffs have alleged reputational and other injuries arising directly from Defendants' violations of the Unruh Act. ..........8

1. *Elements of Unruh Act Claim* .......................................................8

2. *By alleging that Defendants provide a commercial, for-profit service for the benefit of both consumers and landlords, Plaintiffs allege facts showing that Defendants' services are included within the definition of "business establishment."*...............................................................10

3. *By alleging that immigrants comprise the overwhelming majority of adults who have received SSNs since 2011, Plaintiffs allege facts showing that Defendants intended to discriminate on the basis of immigration status or a similar protected status by adopting a policy and practice to routinely and reflexively issue reports warning that recent immigrants are likely to be engaged in SSN fraud.* ..............................................................15

4. *By alleging that Defendants' reports portrayed them as fraudsters, and by alleging that those reports were a causal factor in the denial of their rental applications, Plaintiffs allege facts showing that they suffered injuries arising from Defendants' provision of services.* ........................19

**V. CONCLUSION..........................................................................21**

1

## TABLE OF AUTHORITIES

2

**Cases**

*Alcorn v. Anbro Eng'g, Inc.*,
   2 Cal. 3d 493; 86 Cal. Rptr. 88; 468 P.2d 216 (1970)..........................8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................7

*Butler v. Adoption Media, LLC*,
   486 F. Supp. 2d 1022 (N.D. Cal. 2007).......................................11

*Candelore v. Tinder, Inc.*,
   19 Cal. App. 5th 1138; 228 Cal. Rptr. 3d 336 (2018) ................... 12, 19

*Dworkin v. Hustler Magazine, Inc.*,
   867 F.2d 1188 (9th Cir. 1989).................................................7

*Gardner v. Vic Tanny Compton, Inc.*,
   182 Cal. App. 2d 506; 6 Cal. Rptr. 490 (1960) ...........................11

*Gen'l Conf. Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregat'l Church*,
   887 F.2d 228 (9th Cir. 1989) ..................................................8

*Jancik v. Redbox Automated Retail, LLC*,
   No. SACV 13-1387-DOC (RNBx), 2014 U.S. Dist. LEXIS 67223
   (C.D. Cal. May 14, 2014) ....................................................13

*Lyon v. Chase Bank*,
   656 F.3d 877 (9th Cir. 2011) ..................................................7

*McWright v. Alexander*,
   982 F.2d 222 (7th Cir.1992) ............................................. 17, 19

*National Fed'n of the Blind v. Target Corp.*,
   582 F. Supp. 2d 1185 (N.D. Cal. 2007).....................................12

*New.Net, Inc. v. Lavasoft*,
    356 F.Supp.2d 1090 (C.D. Cal. 2004).......................................7

*O'Connor v. Village Green Owners Ass'n*,
   33 Cal. 3d 790; 191 Cal. Rptr. 320; 662 P.2d 427 (1983)...............10

*Pacific Shores Props., Ltd. Liab. Co. v. City of Newport Beach*,
   730 F.3d 1142 (9th Cir. 2013 ............................................. 16, 17, 18

*Robles v. Domino's Pizza, LLC*,
   913 F.3d 898 (9th Cir. 2019) ................................................14

*Warfield v. Peninsula Golf & Country Club*,
   10 Cal. 4th 594; 42 Cal. Rptr. 2d 50; 896 P.2d 776 (1995) ............11

*Wilkins-Jones v. County of Alameda*,
   859 F.Supp.2d 1039 (N.D. Cal. 2012)........................................9

iv

**Statutes**

Cal. Civ. Code § 51(b) ................................................................................8

**Rules**

Cal. Civ. Code § 51, Historical Notes-Historical and Statutory Notes ...................11

Fed. R. Civ. P. 12(c) .................................................................................7

## I. __INTRODUCTION__

RentSpree operates an online service to match consumers with landlords who are offering rental housing. Consumers can use the service to identify rental properties that interest them and submit applications through RentSpree to the landlord. When it receives a consumer's application, RentSpree also obtains consumer credit and criminal background information from Trans Union and TURSS and reports that information to the landlord, along with the application, which the landlord will use in whole or in part to make a decision about whether to rent to a consumer. When an applicant has a Social Security number ("SSN") that was issued after 2011, Defendants all follow a policy and practice of including a "fraud indicator" with the information sent to the landlord. This "fraud indicator" notes that the applicant's SSN was very recently issued or not issued by the Social Security Administration, and thus likely to be the product of fraud.

Plaintiffs emigrated to the United States in 2010 and obtained work authorizations and SSNs in December 2011. They became citizens in 2016. In January 2022, Plaintiffs applied for rental housing using the RentSpree platform, and, in connection with that application, Defendants published their "fraud indicator" about Plaintiffs, that their SSNs were very recently issued, or not issued at all by the Social Security Administration, indicating that they were involved in fraudulent activity. Defendants' publication of this false and defamatory information

about Plaintiffs caused them profound reputational injury and emotional distress, among other harms.

Plaintiffs have asserted a class action against Defendants, alleging that Defendants' policies and practice for reporting Plaintiffs' SSNs violates both federal and California statutes. Specifically, that policy and practice violates consumer reporting laws, including the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*. ("FCRA") and the California Consumer Credit Reporting Agencies Act, Cal. Civ. Code § 1785.1, *et seq*., ("CCRAA"). Plaintiffs also allege that Defendants' policy and practice violates the Unruh Act, Cal. Civ. Code § 51 ("Unruh Act" or "the Act"), because it discriminates against persons who were born outside the United States and who acquired SSNs only after emigrating here. With respect to the Unruh Act, Plaintiffs' legal theory is that Defendants' purportedly neutral policy about post-2011 SSNs is a proxy for making an invidious identification of immigrants.

Defendants ask this Court to grant them judgment on the pleadings, arguing that, as alleged by Plaintiffs, the facts show beyond dispute that: (1) the Unruh Act cannot apply to them because none of them operate the kind of "business establishment" covered by the Act; (2) that their policy and practice is facially neutral and cannot be characterized as an instrument for intentional discrimination; and (3) that their policy and practice did not cause any of Plaintiff's injuries. All of these arguments fail. First, the plain language of the statute and courts have

repeatedly made it abundantly clear that the Act applies to any commercial enterprise. Courts have specifically applied the Act to online matching services that are materially identical to the service that RentSpree offers. Second, Plaintiff has alleged facts showing that the overwhelming majority of adults who have received SSNs since 2011 are immigrants and that Defendants' policy and practice is directed at immigrants and others who are similarly situated, even if Defendants have framed that policy and practice to look neutral. Third, Plaintiffs have specifically alleged that they suffered reputational injuries and emotional distress as a direct result of Defendants' false and defamatory reporting, and these kinds of injuries are compensable under the Act.

For all of these reasons, the Court should deny the Joint Motion.

## II.    STATEMENT OF FACTS

Plaintiffs' sought asylum in the United States and emigrated here in June 2010. First Amended Complaint (FAC)(Dkt. 28) ¶ 58, PageID 190. They were granted work authorization in December 2011, and the Social Security Administration issued SSNs to them at that time. *Id.* ¶ 59, PageID 190. Plaintiffs were granted permanent citizenship by the end of 2016. *Id.* ¶ 61, PageID 190.

Plaintiffs sought to find rental housing through RentSpree, which operates an online platform that works as a matching service for landlords and prospective tenants. RentSpree's website lists available rental properties and acts as a portal

through which consumers can submit rental applications. RentSpree also obtains consumer reports and criminal background checks on the applicants, and it submits the application and other consumer information to the landlord. These consumer reports and background checks are derived from information that originates with Trans Union and TURSS. FAC ¶¶ 20-28, PageID 185-86.

Plaintiff alleges that each of the Defendants is a commercial enterprise that engages in for-profit transactions, which include the kind of transactions facilitated through RentSpree's online platform. Plaintiff alleges that RentSpree "is a 'reseller,' as defined in 15 U.S.C. § 1681a(f) and that it "is regularly engaged in the business of assembling and merging information contained in the database of another consumer reporting agency concerning any consumer for the purpose of furnishing such information to third parties through 'consumer reports' as defined in 15 U.S.C. § 1681a(d)." FAC ¶ 10, PageID 182. Resellers like RentSpree are, in fact, consumer reporting agencies under the FCRA. 15 U.S.C. § 1681a(u). Plaintiff also alleges that Trans Union "is a 'consumer reporting agency,' as defined in 15 U.S.C. § 1681a(f) and Cal. Civ. Code § 1785.3(d) and that it "is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing 'consumer reports' as defined in 15 U.S.C. § 1681a(d) and Cal. Civ. Code § 1785.3(c), to third parties." *Id*. ¶ 11, PageID 182-83. Plaintiff makes the same allegations against TURSS that it makes against Trans Union. *Id*. ¶ 12,

PageID 183. In addition, Plaintiff also alleges that all defendants "regularly furnish consumer reports to third parties for monetary compensation." *Id*. ¶ 15, PageID 184.

Plaintiffs submitted rental applications through RentSpree, and, relying on consumer information provided by Trans Union and TURSS, RentSpree compiled a consumer report about the Plaintiffs. FAC ¶¶ 38-41, PageID 187-88. RentSpree's reporting to potential landlords included a "Fraud Indicator" which asserted that Plaintiffs' "SSN may be invalid – it was either very recently or never issued by the Social Security Administration." *Id*. ¶ 42, PageID 188. All Defendants reported false and defamatory information about the Plaintiffs to third parties.

Plaintiff Ms. Ahmed contacted RentSpree to dispute the accuracy of its "Fraud Indicator." FAC ¶ 63, PageID 191. RentSpree advised her that the "Fraud Indicator" originated with TURSS and that Plaintiffs contact TURSS to submit a dispute. *Id*. ¶ 64, PageID 191. When Ms. Ahmed contacted TURSS to dispute the outrageous, false information, TURSS informed her that the "Fraud Indicator" actually originated with Trans Union. *Id*. ¶ 74, PageID 192. Thereafter, Ms. Ahmed contacted Trans Union to register their dispute, and Trans Union informed her that it included the "Fraud Indicator" in their consumer reports pursuant to a policy that applied to all SSNs issued after 2011. *Id*. ¶¶ 75-82, PageID 192-93. None of the Defendants conducted the reinvestigations required by the FCRA when a consumer disputes the accuracy of information appearing on their consumer reports.

Plaintiff alleges facts showing that Defendants' policies and practices regarding this "Fraud Indicator" constitute intentional discrimination. Plaintiff alleges that "[c]onsumers with social security numbers issued after 2011 who are applying for housing are likely to be immigrants to the United States." FAC ¶ 93, PageID 195. Plaintiff further alleges that it is both factually inaccurate and discriminatory for Defendants to follow a blanket policy that associates immigrants with a "Fraud Indicator" that suggests that their SSNs are likely to be fraudulent. *Id.* ¶¶ 94-96, PageID 195.

On the basis of these factual allegations, Plaintiffs assert claims against Defendants under the FCRA, CCRAA, and the Unruh Act. With respect to each statute, they seek to represent a class of persons who had been adversely affected by Defendants' policy and practices about post-2011 SSNs. FAC ¶¶ 97-120, PageID 196-201 (setting forth class allegations). With respect to their Unruh Act claim, Plaintiffs allege that "Defendants intentionally chose to label consumers with social security numbers issued after 2011 as fraudulent or fake based on discriminatory reasons . . . " *Id.* ¶ 204, PageID 214. Plaintiffs also allege that this intentional discrimination is undertaken against consumers "on the basis of their ancestry, national origin, genetic information, citizenship, primary language, and/or immigration status." *Id.* ¶ 207, PageID 215. Plaintiffs further allege that Defendants' discriminatory policies and practices were the direct and proximate cause of their

injuries, which included, among other things, reputational harm and emotional distress. *Id.* ¶¶ 84-85, PageID 193-94.

## III.  <u>LEGAL STANDARD</u>

The Federal Rules of Civil Procedure provide that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Rule 12(c) provides a means of disposing of cases when the material facts are not in dispute and a judgment on the merits can be achieved by looking at the content of the competing pleadings and their exhibits, matters incorporated by reference in the pleadings, and any facts of which the district court will take judicial notice. *Lyon v. Chase Bank*, 656 F.3d 877, 883 (9th Cir. 2011); *see also New.Net, Inc. v. Lavasoft*, 356 F.Supp.2d 1090, 1115 (C.D. Cal. 2004).

The standard applied to a motion for judgment on the pleadings is "functionally identical" to the standard applied to a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). Under this standard, "[a] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (discussing Rule 12(b)(6)). A complaint states a facially plausible claim for relief "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* (citation omitted). "All allegations of fact by the party opposing the motion are accepted as true, and are construed in the light most favorable to that party." *Gen'l Conf. Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregat'l Church*, 887 F.2d 228, 230 (9th Cir. 1989).

## IV.    ARGUMENT

    **A.    Plaintiffs have alleged sufficient facts to state a plausible claim under the Unruh Act because Defendants are all commercial enterprises covered under the Act, because Plaintiffs have alleged facts showing that Defendants' purportedly neutral policy effected discrimination against immigrants and others by proxy, and because Plaintiffs have alleged reputational and other injuries arising directly from Defendants' violations of the Unruh Act.**

    *1.    Elements of Unruh Act Claim*

The Unruh Act provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b). The purpose of the Unruh Act is to prohibit discrimination "by a 'business establishment' in the course of furnishing goods, services or facilities to its clients, patrons or customers." *Alcorn v. Anbro Eng'g, Inc.*, 2 Cal. 3d 493, 500; 86 Cal. Rptr. 88; 468 P.2d 216 (1970).

8

To state a claim for a violation of the Unruh Act, a plaintiff must allege the following elements:

(1)     that he or she was denied the full and equal accommodations, advantages, facilities, privileges, or services in a business establishment;

(2)     that his or her protected status was a motivating factor for this denial;

(3)     that the defendant denied plaintiff the full and equal accommodations, advantages, facilities, privileges, or services; and

(4)     that defendants' wrongful conduct caused plaintiff to suffer injury, damage, loss or harm.

*See Wilkins-Jones v. County of Alameda*, 859 F.Supp.2d 1039, 1048 (N.D. Cal. 2012).

Defendants argue that Plaintiffs' complaint fails to allege facts that could establish three of these elements: that Defendants' commercial enterprises fit within the definition of "business establishment" for the purposes of the Act; that Defendants' engaged in intentional discrimination; and that Defendants conduct was a cause of Plaintiffs' injuries. *See, generally*, Memorandum of Points and Authorities in Support of Joint Motion (Dkt. 63-1) ("Joint Mem.") All of these arguments fail because Defendants misrepresent the nature of Plaintiffs' allegations and ignore the law.

9

>   ### 2. By alleging that Defendants provide a commercial, for-profit service for the benefit of both consumers and landlords, Plaintiffs allege facts showing that Defendants' services are included within the definition of "business establishment."

Defendants contend that Plaintiffs' Unruh Act claim is facially defective because Plaintiffs have failed to allege facts showing that any of the Defendants' enterprises fit within the meaning of "business establishment" for the Act. Joint Mem. at 7-9, PageID 544-45. This argument fails because it disregards well-established precedent holding that any commercial enterprise fits the definition of "business establishment" and because Defendants ignore crucial allegations in Plaintiffs' First Amended Complaint. Indeed, the two primary cases that Defendants cite on this point contradict their argument and demonstrate that Plaintiffs have alleged sufficient facts to show that Defendants' services are covered by the Unruh Act.

The California Supreme Court has explained that "the term 'business establishments' [in the Unruh Act] was used in the broadest sense reasonably possible." *O'Connor v. Village Green Owners Ass'n*, 33 Cal. 3d 790, 795; 191 Cal. Rptr. 320; 662 P.2d 427 (1983). As the *O'Connor* Court reasoned, "the word 'establishment,' as broadly defined, includes not only a fixed location . . . but also a permanent 'commercial force or organization.'" *Id*. This broad reading of the term "business establishment" followed the California legislature's 1959 amendments to the Act, which eliminated the list of physical places contained in the Act and

replaced it with the reference to "all business establishments of every kind whatsoever." *Warfield v. Peninsula Golf & Country Club*, 10 Cal. 4th 594, 618; 42 Cal. Rptr. 2d 50; 896 P.2d 776 (1995) (discussing 1959 amendments to the Unruh Act); *Gardner v. Vic Tanny Compton, Inc*., 182 Cal. App. 2d 506, 512; 6 Cal. Rptr. 490 (1960) (describing interpretation of previous statutory language limiting Unruh Act to "all other places"). In its most recent amendments to the Unruh Act, the legislature expressly affirmed the expansive judicial construction of "business establishment." See Cal. Civ. Code § 51, Historical Notes-Historical and Statutory Notes ("It is the intent of the Legislature that the amendments made to the Unruh Civil Rights Act by this act do not affect the California Supreme Court's rulings in [*Marina Point, Ltd. v. Wolfson*, 30 Cal. 3d 721; 180 Cal. Rptr. 496; 640 P.2d 115 (1982)] and [*O'Connor, supra*].").

Courts have specifically and repeatedly held that the meaning of "business establishment" includes enterprises that offer various kinds of computerized and/or online services, including websites and mobile apps. For example, in *Butler v. Adoption Media, LLC*, 486 F. Supp. 2d 1022 (N.D. Cal. 2007), the plaintiffs asserted an Unruh Act claim against an internet-based adoption agency, which offered services through several adoption-related websites. One of the websites, ParentProfiles.com, offered a service that allowed prospective adoptive parents, for a fee, to post "profiles" containing information about themselves, for review by

11

women who have given birth or are about to give birth and plan to give up the children for adoption. *Id*. at 1025. The plaintiffs alleged that the agency violated the Act because it refused to provide its matching services to same-sex couples who were registered under California's domestic partnership law. *Id*. at 1026. The *Butler* Court treated the defendant's online services as a business establishment for the purposes of the Act. *See id*. at 1054.

In *Candelore v. Tinder, Inc*., 19 Cal. App. 5th 1138; 228 Cal. Rptr. 3d 336 (2018) the California Court of Appeals concluded that a plaintiff had alleged a viable Unruh Act claim against an online dating service by alleging that the service engaged in age discrimination when it charged older users a higher price for certain premium features associated with the service. On the basis of this conclusion, the *Candelore* Court reversed the trial court's decision to sustain the service provider's demurrer. *Id*. at 1143 ("Accordingly, we swipe left, and reverse.").

Similarly, in *National Fed'n of the Blind v. Target Corp*., 582 F. Supp. 2d 1185 (N.D. Cal. 2007), the plaintiffs asserted a class action, alleging that a retailer, the Target Corporation, violated the Unruh Act and other anti-discrimination statutes because its website, Target.com, was not accessible to blind persons. In discussing whether the plaintiffs' proposed class could be certified, the district court considered whether the Unruh Act could apply to the operations of a website when those operations were entirely independent of any connection to the physical locations of

the defendant's retail stores. It concluded that the Act "reach[es] Target.com as a kind of business establishment and an accommodation, advantage, facility, and privilege of a place of public accommodation, respectively. No nexus to the physical stores need be shown." *Id.* at 1196.

Given this authority, Defendants cannot seriously contend that their enterprises do not fall within the meaning of "business establishment" under the Unruh Act. Trans Union and TURSS are consumer reporting agencies who offer a commercial service that is an essential aspect of many consumer transactions, including applications to rent residential property. This makes them the kind of "'commercial force or organization'" that is covered by the Unruh Act. *See O'Connor*, 33 Cal. 3d at 795. And, as an online service that matches landlords with prospective tenants, RentSpree offers services that are materially identical to the kinds of services that were covered by the Act in *Candelore and Butler*, *supra*.

Indeed, even the two cases that Defendants cite on this point contradict their argument because, in each case, courts permitted a plaintiff to assert an Unruh Act claim arising from discrimination in the provision of an online service. In *Jancik v. Redbox Automated Retail, LLC*, No. SACV 13-1387-DOC (RNBx), 2014 U.S. Dist. LEXIS 67223 (C.D. Cal. May 14, 2014), the plaintiff, who was deaf, sued a video rental service under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. ("ADA") and the Unruh Act. The defendant offered videos for rent at both vending

machines outside retail stores and through an online service. The plaintiff alleged that the service violated those statutes in two ways: (1) when it failed to accommodate hearing-impaired persons by maintaining an inventory with a sufficient number of closed-captioned videos; and (2) when it declined to fulfill the plaintiff's requests for specific closed-captioned videos. *Id*. at \*2-3. The district court dismissed the plaintiff's claim with respect to the first theory, concluding that neither the ADA nor the Unruh Act required a commercial enterprise to maintain products in its inventory that were accessible to hearing impaired consumers. *Id*. at \*9-10. But the district court denied the defendant's motion to dismiss with respect to the second theory of discrimination because it concluded that both the ADA and the Unruh Act required a service provider to fulfill special requests for accessible or special goods as long as such accessible or special goods could be acquired from the suppliers from whom the business customarily obtains its inventory. *Id*. at \*12-16. Thus, contrary to Defendants' assertions, the *Jancik* Court permitted an Unruh Act claim against the provider of an online service.

Similarly, in *Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019), the plaintiff, who was blind, alleged that Domino's Pizza violated the ADA and Unruh Act by operating its website and mobile application in a manner that made them inaccessible to visually impaired persons. Specifically, the plaintiff alleged that he used screen-reading software to access the internet, but that Domino's website

14

and app were not compatible with such software, preventing him from using a computer or mobile device to place orders and to receive discounts that are available only for online ordering. *Id*. at 902 The Ninth Circuit held that the ADA and the Unruh Act applied to Domino's website and app because they were the means by which persons access the goods and services available at Domino's restaurants. *Id*. at 905.

Simply put, Defendants misunderstand and misstate the law with respect to the question of whether they are covered by the Unruh Act. For the purposes of the Act, the meaning of "business establishment" is not limited to physical places, such as retail stores; it includes any and all commercial enterprises, including those that operate entirely online. Defendants all fit into that definition, and Plaintiff alleges facts to show as much.

> 3. *By alleging that immigrants comprise the overwhelming majority of adults who have received SSNs since 2011, Plaintiffs allege facts showing that Defendants intended to discriminate on the basis of immigration status or a similar protected status by adopting a policy and practice to routinely and reflexively issue reports warning that recent immigrants are likely to be engaged in SSN fraud.*

Defendants argue that Plaintiff has not alleged facts to show that their policies and practices about post-2011 SSNs were instruments for intentional discrimination. Joint Mem. at 9-12, PageID 551-54. According to Defendants, Plaintiffs' allegations establish that these policies and practices were "facially neutral" because they

applied to any and all SSNs issued after 2011 and could not have had any discriminatory effect on the basis of anyone's ancestry, national origin, genetic information, citizenship, primary language, and/or immigration status. Here again, Defendants' argument fails because it disregards specific factual allegations in Plaintiffs' First Amended Complaint and because it fails to recognize the well-established legal principle that a purportedly "neutral" policy or practice can still be an instrument for intentional discrimination when "neutral" criteria are a proxy for invidious distinctions.

A policy or practice can be discriminatory even it applies to persons who are not in a protected classification. The Ninth Circuit has explained that this principle "undergirds all of constitutional and statutory anti-discrimination law, although it often goes unsaid precisely because it is so foundational." *Pacific Shores Props., Ltd. Liab. Co. v. City of Newport Beach*, 730 F.3d 1142, 1160 (9th Cir. 2013). This principle recognizes that "[d]iscriminatory laws, policies, or actions will often have negative effects (whether intended or not) on individuals who do not belong to the disfavored group. This does not, however, change the fact that such laws, policies, or actions are discriminatory when they are undertaken for the purpose of harming protected individuals." *Id.*

In light of this principle, courts have recognized that unlawful discrimination can occur "when the defendant enacts a law or policy that treats individuals

differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." *Pacific Shores*, 730 F.3d at 1160 n.23. This kind of discrimination is often called "proxy discrimination," and it is recognized as a form of facial discrimination. *Id*. "For example, discriminating against individuals with gray hair is a proxy for age discrimination because 'the "fit" between age and gray hair is sufficiently close.'" *Id*. (quoting *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir.1992)).

Plaintiffs allege specific facts showing that Defendants' policies and practices regarding post-2011 SSNs constitute a form of facial discrimination by proxy. As Defendants concede, Plaintiffs allege that Defendants have a policy to include a "Fraud Indicator" in connection with consumer reports and rental applications for consumers who have SSNs issued after 2011. FAC ¶¶ 75-82, PageID 192-93. But Defendants ignore another allegation, which is crucial to Plaintiffs' theory of intentional discrimination: "[c]onsumers with social security numbers issued after 2011 who are applying for housing are likely to be immigrants to the United States." *Id*. at ¶ 93, PageID 195. On the basis of Plaintiffs' allegations, a jury could find that many, if not most of the SSNs issued after 2011 were issued to children, at the time of their birth or shortly thereafter. Of course, the children who have received new SSNs since 2011 lack the legal capacity to rent property. In fact, they lack the legal

capacity to even enter into a contract with RentSpree by which they would submit

an application to lease rental property. As Plaintiff alleges, the overwhelming

majority of adults who have received SSNs since 2011 are immigrants, having

received an SSN because they, like Plaintiffs, received work authorization and/or

citizenship upon their entry to the United States. Simply put, in the context of

applications for housing, Defendants' purportedly "neutral" policy is a proxy for

identifying immigrants and other persons on the basis of "their ancestry, national

origin, genetic information, citizenship, [and/or] primary language." *Id*. ¶ 207,

PageID 215. Plaintiffs' allegations set forth a plausible theory of intentional

discrimination by proxy. *See Pacific Shores*, 730 F.3d at 1160 n.23.

Defendants make an absurd effort to distract from the obvious effect of their

policy, arguing that the neutrality of their policy is proven by the fact that all of the

following persons would be affected by the same: "a Caucasian man born in

Wisconsin in January 2012; an African American woman who had a new social

security number issued in September 2012; a homosexual victim of identity theft

who had his social security number issued in January 2013." Joint Mem. at 11,

PageID 553. Of course, "a Caucasian man born in Wisconsin in January 2012" is (at

the time of this writing) not quite thirteen years old; and at the time of the events

from which this case arises, he was ten. Presumably, Defendants (if not their

counsel) recognize that a ten or thirteen year-old "Wisconsin man" cannot apply for

housing or execute an apartment lease by himself.[1] While it is true that some non-immigrant adults have received new SSNs since 2011 for reasons such as physical safety or identity theft, such adults are a small fraction of the population of other adults who have recently received new SSN. This much larger population is comprised of persons who have emigrated to the United States, and these persons are the target of Defendants' discriminatory policy.

Just as having gray hair is a reliable, if imperfect, proxy for age, so too is being a housing applicant with a recently issued SSN is a reliable, if imperfect, proxy for immigrant status and certain other classifications that are protected under the Unruh Act. *See McWright*, 982 F.2d at 228; *see also Candelore*, 19 Cal. App. 5th at 1146-52 (discussing how a purportedly neutral classification could still constitute proxy discrimination). By alleging facts to illustrate the practical – and facially obvious – effect of Defendants' policy regarding post-2011 SSNs, Plaintiff has alleged facts showing that Defendants' policy is an instrument for intentional discrimination against persons protected by the Unruh Act.

> 4.    *By alleging that Defendants' reports portrayed them as fraudsters, and by alleging that those reports were a causal factor in the denial of their rental applications, Plaintiffs allege facts showing that they suffered injuries arising from Defendants' provision of services.*

---

[1] "Children can't apply for credit on their own until they're 18." https://www.transunion.com/fraud-victim-resources/child-identity-theft?atvy=%7B%22261809%22%3A%22Experience+B%22%7D

Defendants' other argument for dismissal pertains to the causation element of an Unruh Act claim. According to Defendants, Plaintiffs' only injury is the denial of their housing application, and Defendants contend that Plaintiffs have not alleged – and could not allege – any facts to show that Defendants made or participated in the decision to deny their application. Joint Mem. at 8-9, PageID 550-51. This argument fails because, once again, Defendants utterly disregard the law and the contents of Plaintiffs' allegations. Under the Unruh Act, a plaintiff is entitled to damages regardless of whether they suffered any injury other than being subject to the defendant's discrimination. Moreover, Plaintiffs allege other injuries as well. They specifically alleged that they and the putative class members suffered the communication of defamatory statements to third parties, reputational injuries when Defendants falsely and unlawfully labeled them as fraudsters, as well as emotional distress, and other injuries that were entirely independent of any decision on their rental applications. These injuries are enough to support an Unruh Act claim.

A person who has suffered the kind of discrimination prohibited by the Unruh Act is entitled to an award regardless of whether they have suffered any actual damages. California law provides that "any person denied the rights provided in Section 51 [the Unruh Act]" is entitled to "actual damages" along with an additional award of "any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case

less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto." Cal. Civ. Code § 52(a).

Plaintiffs have alleged reputational injuries arising from Defendants' various published statements which identified them as likely fraudsters. Specifically, Plaintiffs alleged that Defendants' "fraud indicator, along with additional information belonging to Plaintiffs, was published to third parties by Defendants in or around January 2022." FAC ¶ 84, PageID 193. Plaintiffs also allege that this publication caused "reputational harm" with prospective landlords and others because it associated them with utterly unfounded allegations of fraud, and that it caused a variety of emotional distress injuries as well. *Id.* ¶ 85, PageID 193-94. All of these alleged injuries are independent of the denial of their housing application, and they are all directly traceable to Defendants' policy, which routinely leads to the publication of reports in which recent immigrants are falsely labeled as fraudsters.

## V.    **CONCLUSION**

Plaintiffs allege that Defendants have violated the Unruh Act by implementing a purportedly neutral policy that targets immigrants for discrimination by proxy. As commercial enterprises offering services to the public, Defendants are subject to the Act, which recognizes discrimination by proxy as intentional discrimination. Plaintiffs further claim they suffered reputational harm, emotional distress, and other injuries directly caused by Defendants' unlawful and

discriminatory policy. These allegations establish a plausible claim under the Act, warranting denial of Defendants' Joint Motion.

RESPECTFULLY SUBMITTED,

DATED: December 9, 2024

By: */s/ Susan M. Rotkis*
Susan M. Rotkis (AZ: 032866)
*Admitted pro hac vice*
**CONSUMER ATTORNEYS**
2290 East Speedway Blvd.,
Tucson, AZ 85716T: (602) 807-1504
F: (718) 715-1750
E: srotkis@consumerattorneys.com

Youssef H. Hammoud (SBN: 321934)
**HAMMOUD LAW, P.C.**
3744 E. Chapman Ave., #F12269
Orange, CA 92859
T: (949) 301-9692
F: (949) 301-9693
E: yh@lawhammoud.com

*Attorneys for Plaintiffs,*
*Hala Ahmed and Maali Salim,*
*on behalf of themselves and all*
*similarly situated individuals*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 9, 2024, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notice of such filing to all attorneys of record in this matter. Since none of the attorneys of record are non-ECF participants, hard copies of the foregoing have not been provided via personal delivery or by postal mail.

*/s/ Roxanne Harris*